**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES EVANS, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | 14-CV-10518 |
| | ) | |
| v. | ) | Thomas M. Durkin |
| | ) | |
| OFFICER ANDREW GASCA, STAR #13944, | ) | |
| OFFICER MARK KOCHAN, STAR #1316, | ) | |
| OFFICER MARK LONSKI, STAR #21113, AND | ) | |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Charles Evans filed this action on December 30, 2014, asserting claims for (1) recovery pursuant to 42 U.S.C. § 1983 against Chicago Police Officers Andrew Gasca, Mark Kochan and Mark Lonski based on alleged violations of Evans's Fourth and Fourteenth Amendment rights (Count I), and (2) indemnification from the City of Chicago pursuant to 745 ILCS 10/9-102 (Count II). On February 8, 2016, Defendants move to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).[1] The Court denies Defendants' motion.

**STANDARD OF REVIEW**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

---

[1] The complaint is the First Amended Complaint filed on June 15, 2015, R. 14.

U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). The plausibility standard requires that the complaint demonstrate that there is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555. "A formulaic recitation of the elements of a cause of action will not [suffice]." *Id.* "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## BACKGROUND

The following facts are from the complaint, as well as the attached transcripts of court proceedings in Evans's criminal case. *See Papasan v. Allain,* 478 U.S. 265, 269 (1986) (court may take judicial notice of items in the public record).

### 1.    EVANS'S ARREST FOR THE MINI MART BURGLARY

Evans was employed as a security guard at Sam's Mini Mart (the "Mini Mart"), located at 1822 West 63rd Street, Chicago, IL 60636. R. 14 at 2 (¶ 7). On either September 15 or 16, 2013,[2] Evans received a call from his employer, Mohammad Abdallah,[3] instructing him to investigate a potential break-in at the Mini Mart. *Id.* (¶ 8). When Evans arrived at the Mini Mart, he discovered the front window had been broken. Evans entered the Mini Mart through the broken window to investigate. *Id.* (¶ 9). As Evans exited the Mini Mart, he was arrested by Officers Kochan and Gasca, even though he advised both officers that he was employed as a security guard at the Mini Mart and was instructed by his supervisor to investigate the break-in. *Id.*

### 2.    OFFICER LONSKI'S TESTIMONY AT EVANS'S PRELIMINARY HEARING

On October 11, 2013, Evans was brought before the Circuit Court of Cook County for a preliminary hearing on the criminal charge of burglary. *Id.* at 3 (¶ 14).[4] Evans has attached a transcript of the preliminary hearing to the

---

[2] The complaint alleges the burglary took place on the morning of September 16, 2013. R. 14 at 2 (¶ 8). The investigating officer testified at Evans's preliminary hearing that the burglary occurred on September 15, 2013, at approximately 5:53 a.m. *See* R. 14-1 at 2.

[3] Mohammad testified at Evans's criminal trial that he is the manager of the Mini Mart. R. 14-2 at 5. The owner is Mohammad's brother, whose name is Abdalla Abdallah. *Id.* at 4-5. Mohammad also testified that the correct spelling of his name is not "Mohamed," as alleged in the complaint, but "Mohammad."

[4] The preliminary hearing was held thirty days after Evans's arrest for purposes of determining whether there was probable cause to try Evans for the burglary. *See* 725 ILCS 5/109-3. The Court has not been provided with any information regarding Evans's initial appearance in state court. *See Gerstein v. Pugh,* 420 U.S. 103, 126

complaint. *See* R. 14-1. Officer Lonski was assigned to investigate the Mini Mart burglary, and he testified at the preliminary hearing as follows:

Lonski first interviewed Kochan, who told Lonski that he (Kochan) was driving on his way home in his personal vehicle when he passed a store and observed a broken window with Evans and a second individual standing outside the window. *Id.* at 2-3. Kochan said that he observed Evans remove a shard of glass from the window, enter the store, and then come out of the store. *Id.* Kochan exited his vehicle and detained the two subjects until Gasca arrived. Kochan and Gasca placed Evans under arrest and took him into custody. *Id.* at 4.

After interviewing Kochan, Lonski contacted Mohammad, who told Lonski that the burglary "was on video surveillance," and that he (Mohammad) "knew the individual from the area." *Id.* at 4-5. He also said that "[h]e did not give anyone permission to enter the store or to remove any items from the store." *Id.* at 5. Mohammad indicated that a BB gun was missing and that a bucket of coins had been moved from behind the cash register to the freezer. *Id.* Lonski showed Mohammad the BB gun recovered by the police from Evans at the time of Evans's arrest, and Mohammad identified it as the one missing from the store. *Id.* Lonski viewed the video surveillance with Mohammad, and saw Evans on the video removing a shard of glass from the broken window, entering the store, looking

---

(1975) (the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention following a warrantless arrest); *Cnty. of Riverside v. McLaughlin,* 500 U.S. 44, 55 (1991) (*Gerstein* hearing to determine probable cause for warrantless arrest is presumptively valid if conducted within 48 hours).

around near an ATM machine, going behind the counter and grabbing a bucket of coins, and finally moving the bucket of coins to the freezer located next to the broken window. *Id.* at 6.

Upon cross-examination by the state public defender, Lonski admitted that Kochan never saw Evans breaking the window. *Id.* Lonski also confirmed that Mohammad said he knew Evans "[f]rom using the store and being in the area." Lonski could not remember, however, whether Mohammad identified Evans by name. *Id.* at 7-8. The trial court sustained the state's relevancy objections to defense counsel's questions about whether Mohammad told Lonski that Evans had done work for him, or whether Mohammad ever said he did not want to proceed with the charges against Evans. *Id.* at 8. Finally, Lonski confirmed on cross-examination that the video showed a second individual inside the store, and that Kochan said that he detained both Evans and the other unidentified individual. *Id.* at 9. The trial court sustained the state's relevancy objections to defense counsel's further attempts to question Lonski about the presence and identity of the second individual who also had been detained. *Id.* at 9-10.

### 3. MOHAMMAD'S TESTIMONY AT EVANS'S BURGLARY TRIAL

Evans was held at the Cook County Jail for more than four months while awaiting his trial, which took place on January 17, 2014. R. 14 at 2, 3 (¶¶ 10, 17). The only witness to testify at trial was Mohammad. *Id.* (¶ 18). Evans has attached a copy of Mohammad's trial testimony to the complaint. *See* R. 14-2. Mohammad testified as follows:

Mohammad hired Evans to work security at the Mini Mart five or six months before the burglary. *Id.* at 6. When the burglary alarm went off, Mohammad called Evans and instructed him to go to the store and protect it until Mohammad got there because Evans lived closer. *Id.* at 8. When Mohammad arrived at the store, Evans was not there because he already had been taken into custody. *Id.* at 9-10. Mohammad reviewed the video, and saw an unknown person break into the store, go to the cash register, remove money, and then leave the store. *Id.* at 10. He saw another person enter the store about an hour later and go behind the counter, retrieve the bucket of change that was kept there, and move the bucket towards the front of the store. *Id.* at 11. He did not see the second person take anything out of the store, and he could not see who the second person was. *Id.*

Mohammad showed the video to the police. *Id.* The police returned later and told Mohammad that the person they had in custody was saying he was a security guard at the Mini Mart. *Id.* The police asked Mohammad if a man named Charles ever worked security for the store. Mohammad told them no because he only knew Evans by the name of "June" or "Smoke." *Id.* at 5-6, 11-12. The police never showed Mohammad a photograph of the person they had in custody. *Id.* at 7. Mohammad learned from Evans's sister at some point while the criminal case was pending that Evans had been arrested for the burglary, and it may have been around the same time that Mohammad also first learned Evans's real name. *Id.* at 7, 12. Mohammad informed the state attorney that the person in custody, Charles Evans, was in fact

the security guard who worked at the Mini Mart and who Mohammad knew by the name of "June" on the day of trial. *Id.* at 12.

Because Mohammad testified that Evans had permission to be in the store, and to secure the BB gun and the bucket of change, *id.* at 6-9, 13, the state moved to *nolle prosequi* the charges against Evans, and Evans was released. *Id.* (¶ 22).

## DISCUSSION

### I. COUNT I—SECTION 1983 CLAIM

Section 1983 provides a civil cause of action to any citizen of the United States against any person who, under color of state law, deprives the citizen of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Federal Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979). In addressing constitutional claims brought under § 1983, therefore, "analysis begins by identifying the specific constitutional right allegedly infringed." *Graham v. Connor*, 490 U.S. 386, 394 (1989).

The parties agree that the complaint alleges a violation of Evans's Fourth Amendment rights. Defendants argue, however, that the complaint only raises the Fourth Amendment issue of whether the police had probable cause to arrest Evans, and that Evans's false arrest claim (Count I) does not include any issue regarding the probable cause determinations made by the judge at the preliminary hearing or by the prosecutor in deciding whether to charge Evans. *See* R. 28 at 5 n. 3. To the extent that Defendants mean that Evans's § 1983 claim is limited to the issue of probable cause for his warrantless arrest, and does not extend beyond that point to his continued detention after his arrest and through the trial, the Court disagrees. The complaint alleges that "Defendant officers arrested, *detained* and *imprisoned* Plaintiff without justification and without probable cause, thus violating Plaintiff's rights under the Fourth and Fourteenth Amendments." R. 14 at 4 (¶ 24) (emphasis added). The "custodial continuum run[s] through initial arrest or seizure, post-arrest but pre-charge or pre-hearing custody, pretrial detention, and post-conviction incarceration." *Austin v. Hamilton*, 945 F.2d 1155, 1158 (10th Cir. 1991) (citing *Titran v. Ackman*, 893 F.2d 145, 147 (7th Cir. 1990) (recognizing different points along custodial continuum to which constitutional standards attach)). With the exception of post-conviction incarceration, the factual allegations of the complaint plainly challenge the entire custodial continuum, notwithstanding that all those facts are contained in a single count entitled "False Arrest." *See, e.g., Robinson v. Bandy*, 2012 WL 1015925, at *4 (N.D. Ill. Mar. 22, 2012) ("[A]lthough defendants' motion refers primarily to the question of probable cause at the time of arrest, the

complaint and the substance of [the plaintiff's] argument concern the circumstances of his arrest *and* his subsequent detention, each of which can support a Fourth Amendment claim.") (emphasis added). Defendants have not made any argument for dismissal of Evans's § 1983 claim to the extent it challenges his post-arrest incarceration. Nevertheless, the Court will briefly address that issue after discussing the issue of probable cause for Evans's arrest. *See, e.g., Herrera v. Pohl*, 2015 WL 7731867, at *3-4 (N.D. Ill. Dec. 1, 2015) (discussing constitutional claims arising from arrest and continued detention separately); *Kruse v. Cnty. of Cook*, 2007 WL 128877, at *14 n. 16 (N.D. Ill. Jan. 11, 2007) *(*same).

### A.    PROBABLE CAUSE TO ARREST EVANS

Defendants argue that the complaint should be dismissed because "Defendant Officers reasonably relied on both first-hand observations of [Evans] [before and at the time of his arrest] and statements from the victim of the crime to form probable cause." R. 28 at 9. Defendants further argue that, "because probable cause had been established from the report of a reasonably credible victim, Mr. Abdullah, there was no constitutional duty for the Defendant officers to investigate further." *Id.* Any information obtained by Lonski from Mohammad after Kochan and Gasca arrested Evans is not relevant to the Court's probable cause analysis in this section. *See Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) ("The existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information."). Therefore, the Court will focus here only on the information known to the arresting

officers on the morning of Evans's arrest,[5] and more specifically, on the information known to Kochan.[6]

To prevail on a claim of false arrest under the Fourth Amendment and § 1983, Evans must show that he was arrested without probable cause. *See Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) ("Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution."). "Police officers have probable cause to arrest an individual when the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense." *Id.* (internal quotation marks and citation omitted). "The court evaluates probable cause not on the facts as an omniscient observer would perceive them, but rather as they would have appeared to a reasonable person in the position of the arresting officer." *Id.* (internal quotation marks and citation omitted).

"Probable cause does not require certainty. It is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (internal quotation marks and citation omitted). "[A] court looks at the conclusions that the

---

[5] The information learned by the investigating officer is addressed in the next section.

[6] The Court infers from the allegations and Defendants' arguments that Gasca participated in Evans's arrest based solely on what Kochan saw and knew.

arresting officer reasonably might have drawn from the information known to him rather than his subjective reasons for making the arrest." *Holmes v. Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). To make that objective assessment, the court "must consider the facts as they reasonably appeared to the arresting officer, seeing what he saw, hearing what he heard, and so forth." *Id.* "A police officer may . . . exercise common sense and draw upon his training and experience in evaluating the totality of the circumstances confronting him, and a court must likewise make allowance for such judgments in deciding what the arresting officer reasonably might have concluded about the facts." *Id.* While probable cause to arrest "depends on the requirements of the applicable state criminal law," *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 761 (7th Cir. 2006), "[i]t does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands," *Gerstein,* 420 U.S. at 121; *see Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1057 (7th Cir. 2011) (probable cause "does not require the existence of criminal activity to be more likely true than not true").

### 1. THE COMPLAINT'S FACTUAL ALLEGATIONS RELATING TO EVANS'S ARREST

There are few, if any, facts alleged in the complaint on the factual question of what Kochan saw and knew at the time of Evans's arrest. This is not surprising, given that Evans likely does not know what Kochan saw or knew. The most that can be inferred is that Kochan saw Evans outside the store standing near a broken window, and that Evans told Kochan he was the security guard. A person commits burglary under Illinois law "when without authority he or she knowingly enters or

without authority remains within a building . . . with intent to commit therein a felony or theft." 720 ILCS 5/19-1. The complaint does not allege that Kochan saw Evans either enter or exit the store.[7] Moreover, the complaint alleges that Evans told Kochan he was the security guard. If Evans's statement was true, he did not enter the store "without authority," which is an element of the crime of burglary. *Id.; see People v. Quarles*, 410 N.E.2d 497 (Ill. App. 1980) (confirmation from a landlord that a defendant lived in an apartment removed probable cause to believe that the defendant had attempted burglary).

An arrest is lawful "once probable cause is established as to each element of an offense." *Spiegel,* 196 F.3d at 725; *see also Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 745-46 (7th Cir. 2003) (probable cause to arrest exists "[o]nce an officer has established probable cause on every element of a crime"); *Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1061 (E.D. Wis. 2015) ("While it is true that probable cause does not 'require the same type of specific evidence of each element of the offense as would be needed to support a conviction,' this does not mean that 'the police can[ ] establish probable cause without at least *some* evidence supporting the elements of a particular offense, including the requisite mental state.") (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972), and *Wesby v. Distr. of Columbia*, 765 F.3d 13, 20 (D.C. Cir. 2014)) (emphasis in original).[8] It is not apparent from the

---

[7] While the complaint alleges that Evans entered the store through the broken window, that admission does not necessarily mean that Officer Kochan witnessed Evans doing so.

[8] In *Gottlieb v. Sgt. Richards,* 2002 WL 31109380, at *3 n. 1 (N.D. Ill. Sept. 23, 2002), Judge Kennelly noted that *Spiegel* makes seemingly inconsistent statements

facts alleged in the complaint that Kochan had sufficient information based on what he saw and knew to reasonably conclude that Evans's conduct satisfied each element of the offense of burglary. *Compare Wesby*, 765 F.3d at 20-21 (officers lacked probable cause to arrest plaintiffs for unlawful entry because the only information known to them at the time of the arrest was what plaintiffs told them, namely, that they entered the house under the belief they had been invited by someone with authority; absent any conflicting information, the invitation "vitiates the necessary element of [p]laintiffs' intent to enter against the will of the lawful owner"), *with Wright v. City of Philadelphia*, 409 F.3d 595, 602-03 (3d Cir. 2005) (officers entitled to discredit plaintiff's innocent explanation for entry into a house in the face of conflicting evidence known to them at the time). Disregarding any duty to further investigate (which the Court will address *infra*), the threshold may be quite low for what Kochan needed to have witnessed for him to have had probable cause to believe that Evans entered the building without authority and with the intent to commit a felony or theft. But the facts at this stage of the proceedings are simply too sketchy to decide whether even that low threshold has been met. Further development of the facts through discovery is required.

### 2. ARRESTING OFFICERS' DUTY TO INVESTIGATE

---

about whether probable cause has to be established "for each and every element" of an offense before an officer is authorized to make a warrantless arrest. Ultimately, however, Judge Kennelly concluded that the alternative proposition for what is needed for an arrest—"reasonably trustworthy information . . . that the arrestee . . . had committed a crime"—would lead to the same result in that case. *Id.* (internal quotation marks and citation omitted). The Court reaches a similar conclusion here.

Defendants argue that by attaching the transcript of the preliminary hearing to the complaint, they can rely on Officer Lonski's testimony at that hearing to establish probable cause for Evans's arrest. *See, e.g., Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir. 2002) ("[b]ecause the letter was attached to the complaint, it became a part of it for all purposes"); *Matter of Wade*, 969 F.2d 241, 249 (7th Cir. 1992) ("A plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment."). But the rule that allows consideration of attached documents does not necessarily mean that those documents may be relied upon for the truth of the matters asserted in them. *See Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 455-56 (7th Cir. 1998) (treating all documents attached to a complaint as representing the truth of the matters asserted would "enable parties to hide behind untested, self-serving assertions"). Lonski did not have personal knowledge about the circumstances of Evans's arrest, and thus testified based on what Kochan told him, meaning much of the testimony is double hearsay. Moreover, this double hearsay testimony is the "factual crux" (*id.* at 456) of the probable cause determination here. It may very well be that Lonski's testimony accurately depicts what happened, but its accuracy simply has never been tested.[9] Thus, there is no

---

[9] The trial court allowed only limited cross-examination. The testimony itself raises obvious unanswered questions, like who was the other individual and what happened to him or her. There also are inconsistencies between what Lonski testified Kochan saw and what Mohammad later testified to at trial about what the video tape showed. For example, Kochan told Lonski that he saw two individuals in the store at approximately the same time and that both were standing outside the window when Kochan initiated the arrest. But Mohammad testified that the video

basis at this point in the proceedings to assign correctness to [Lonski's] unilateral[,] [out-of-court] statements" (*id.*), which without doubt raise "question[s] of credibility and the weight of the evidence" that are "not before [the] [C]ourt [on] [Defendants'] motion to dismiss." *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008) (declining to "assume" that "everything [ ] officers said" in transcript attached to a pleading "is true," and holding instead that the court would consider the transcript at motion to dismiss stage as establishing only "that the officers made the statements" contained therein).

In any event, even if the Court were to accept Lonski's preliminary hearing testimony for the truth of the matters asserted about what Kochan witnessed at the time of the arrest, the Court still could not conclude that Lonski's testimony is sufficient to rule as a matter of law that Kochan had probable cause to arrest Evans. Lonski's entire testimony on the subject is as follows:

> [Kochan] was driving on his way home in his personal vehicle when he passed a store and observed a broken window, and the individual here [identifying Evans in court] standing outside the window[.] . . . And there was a second individual also by the window. He then turned his car around. He called 9-1-1, and he observed Mr. Evans then remove a shard of glass from the window . . . [and] enter[ ] into the store, and then come out of [the] store. . . . He then exited his vehicle and detained the two subjects in front of the store.

R. 14-1 at 3-4. These facts might be sufficient to establish probable cause, even on a motion to dismiss, *but for* one additional piece of information Lonski left out—the

---

showed one individual entering the store and taking cash from the cash register and a second individual arriving *about an hour later* and taking the BB gun from behind the cash register counter.

fact (alleged in the complaint but not brought out at the preliminary hearing) that Evans told the arresting officers he was the security guard and had been asked by his supervisor to investigate the burglary alarm.

Defendants argue that Evans's explanation for why he was there does not negate probable cause for his arrest, citing *Spiegel* and other cases which generally hold that "once probable cause has been established, officials have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Anderer v. Jones*, 385 F.3d 1043, 1049 (7th Cir. 2004) (quoting *Spiegel*, 196 F.3d at 723, quoting *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995)) (omitting internal quotation marks). In the first place, the cases in question generally involve police acting upon probable cause based on the report of the victim or a witness to the crime. *See, e.g., Spiegel,* 196 F.3d at 723 ("'as long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest"). Kochan was not acting on information told to him by someone else. He was acting upon what he had himself witnessed. *See Gottlieb*, 2002 WL 31109380 at *4 (*Spiegel* and similar cases inapplicable where officer "was not relying on information he had learned from a person claiming to be a crime victim" but instead "was relying on his own observations and his own inferences and assumptions").

Moreover, under the *Spiegel* line of cases, the rule of no further duty to investigate arises only because of a reasonable conclusion of probable cause to

16

arrest based on information already known to the officer. *See*, *e.g.*, *Garcia v. City of Chicago,* 24 F.3d 966, 970 (7th Cir. 1994) ("once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence") (internal quotation marks and citation omitted); *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 439 (7th Cir. 1986) (no further duty to investigate where "the facts [the store owner] related to the police (if he told the truth) establish a crime"). But here, if Evans was the security guard as he said, that would not only be "exculpatory" evidence, it would be evidence negating the existence of an essential element of the crime of burglary. *See Wesby*, 765 F.3d at 20 (arresting officers' argument that § 1983 plaintiffs' explanation for entry into house was "irrelevant" to probable cause analysis because it "simply raises a defense for the criminal trial" rejected by court because plaintiffs' explanation would be "a valid defense at trial *precisely because it precludes the government from proving what it must—that a defendant knew or should have known that his entry was against the will of the lawful occupant*") (internal quotation marks and citation omitted) (emphasis in original). Therefore, this case presents a different situation from one where there is already probable cause to believe the arrestee committed a crime but further investigation might lead to evidence that ultimately shows he did not. Here, the officers may have had a further duty to investigate if, based on what they saw or knew, it would have been unreasonable to reject out-of-hand Evans's claim that he had authority from the owner to enter the store, because lack of authority is an

17

element of the crime of burglary. *See Gottlieb,* 2002 WL 31109380, at *4 (officer had a duty to further investigate because he lacked a reasonable basis to believe that plaintiff knew the information she gave the police was false, where knowledge was an element of the crime).

This is not to say that a police officer must always investigate a suspect's claim of innocence. As the Seventh Circuit has said, "criminal suspects frequently protest their innocence." *Beauchamp,* 320 F.3d at 744. Thus, "a suspect's denial of guilt generally is not enough to trigger a duty to investigate in the face of a reasonably believable witness and readily observable events." *Id.* (citation omitted). But *Beauchamp* speaks in terms of generalities, not absolutes. *See id.* ("once an officer learns sufficient trustworthy information establishing probable cause, he is entitled to rely on what he knows in pursuing charges or an arrest, and is under no further duty to investigate," "[a]*lthough* a potentially solid claim of alibi might warrant more credit than a bald assertion of innocence"). Further, it lays out "an important caveat: the police can rely solely on th[e] victim['s report for probable cause to arrest] 'unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate.'" *Love v. City of Chicago*, 2015 WL 2193712, at *8 (N.D. Ill. May 7, 2015) (quoting *Beauchamp,* 320 F.3d at 743)); *see also McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) ('An officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation."); *Guzell v. Hiller*, , 520 (7th Cir. 2000) ("[p]olice must act reasonably on the basis of what they know," and "if what they

know" includes information that calls into question probable cause, "they can't close their eyes to th[at] additional information").

In *Guzell*, 223 F.3d at 520, the Seventh Circuit noted that the exception to the general rule that police do not have a duty to investigate "turns out to be an important qualification." To what degree the exception applies in a given case depends on the amount of information the arresting officers have and the exigency of the situation. *BeVier v. Hucal*, 806 F.2d 123, 127 (7th Cir. 1986) (probable cause "is a function of information and exigency"); *see, e.g., Zitzka v. Village of Westmont*, 743 F. Supp. 2d 887, 910 (N.D. Ill. 2010) (genuine issue of material fact on motion for summary judgment as to whether police officer should have conducted further investigation where, among other things, "there was no danger of imminent repetition that required immediate action"); *Claeys v. Village of Brookfield*, 2004 WL 2124621, at 8 (N.D. Ill. 2004) (summary judgment denied where investigating officer failed to interview several witnesses, raising disputed issue of fact as to whether officer "pursued reasonable avenues of investigation before arresting plaintiff"); *Anderson v. Landrum*, 2015 WL 1538243, at *8 (N.D. Ill. Mar. 31, 2015) (declining to overturn jury verdict in favor of the plaintiff where there was conflicting evidence on the issue of whether plaintiff's arrest without further investigation was reasonable). As the Seventh Circuit explained, "[t]he amount of information that prudent police will collect before deciding to make a search or an arrest, and hence the amount of probable cause they will have, is a function of the gravity of the crime, and especially the danger of its imminent repetition. If a

multiple murderer is at large, the police must compress their investigation and make the decision to search or arrest on less information than if they could investigate at their leisure." *Llaguno v. Mingey*, 763 F.2d 1560, 156 (7th Cir. 1985).[10]

The Court cannot say on the present record whether the circumstances were such that the arresting officers were faced with only two choices—either arrest Evans immediately or let him go. If that turns out to be the case, then the reasonableness of the officers' actions in arresting Evans may be one that can be resolved in their favor on a motion for summary judgment. But on the current record, the Court does not perceive any reason why the officers could not have detained Evans pursuant to their power "to perform an investigatory stop" based on "a reasonable and articulable suspicion of wrongdoing," *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013), and then attempt to verify the accuracy of Evans's

---

[10] Defendants fail to discuss the issue of exigency and the degree to which under the circumstances additional investigation into Evans's statement that he was the security guard would have been difficult. Instead, they insist that there simply is no duty to investigate under any circumstances. To support their claim that there is an absolute rule relieving the arresting officers of any duty to investigate, Defendants cite to case law dealing with a *victim's* right (or, more appropriately, lack thereof) to compel the police to conduct an investigation. R. 32 at 2 (citing *De Shane v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015), and *Gomez v. Whitney*, 757 F.2d 1005 (9th Cir. 1985)). The representation that these cases stand for the principle that there is "no such [constitutional] right to a police investigation," R. 32 at 2, is completely unfounded, since these cases have nothing to do with the question of whether an individual's Fourth Amendment rights are violated when the police place him or her under arrest without conducting a sufficient investigation into probable cause for the arrest. Persons arrested on suspicion of having committed a crime are owed a duty of police investigation of some sort before they are deprived of their liberty, notwithstanding that victims of crime, who do not suffer a deprivation of liberty interest, do not have the same right.

assertion that he was the security guard before they placed him under arrest. A reasonable inference from Mohammad's testimony is that he arrived on the scene not long after Evans was arrested, and, had the arresting officers simply waited until then they might have been able to immediately clear up any doubt about Evans's identity. *See, e.g., Strong v. Jackson*, 2012 WL 3151315, at *6 (N.D. Ill. July 30, 2012) (a reasonable officer would have detained the suspect and then conducted at least some limited investigation before placing him under arrest); *see also Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1016 (7th Cir. 2006) (reversing district court's grant of summary judgment in favor of police officers on the issue of probable cause where officers arrested plaintiff "[r]ather than waiting to obtain [ ] critical information" that "would have allowed [them] to confirm the [plaintiff's] alibi," and stating that, "given that *the lynchpin* of a probable cause determination was *on the verge of being obtained*," a jury could conclude that "the officers' arrest of [the plaintiff] before reviewing [the critical information] . . . [was] *unreasonably premature*") (emphasis added). It is possible the officers did make some attempt to verify Evans's identity, in which case, there may have been probable cause to arrest Evans even if their attempts at verification failed. But the point is that the record does not reveal any of these facts, and so the probable cause issue cannot be resolved on Defendants' current motion.

Because of the fact-specific nature of the inquiry, the vast majority of cases dealing with the issue of a police officer's duty to conduct further investigation are decided on summary judgment or after a trial. In one of the few cases like this one

addressing the issue on a motion to dismiss, the district court held that the complaint's allegations, with inferences made in the light most favorable to the plaintiff, plausibly suggested that the failure of the arresting officers to conduct a further investigation by simply asking one or two other witnesses who were present at the scene what happened "could be deemed unreasonable." *Love,* 2015 WL 2193712, at *8. There was no immediate evident danger in that case which would have prevented the arresting officers from questioning the other witnesses before arresting the plaintiff. *Id.* As the district court noted, "[t]he suggestion here is not that [the arresting] officers needed to carry out a full-blown investigation into whether [the plaintiff] had permission to be on the lot," and, "indeed, not much additional effort at clarification might have sufficed to defeat [the plaintiff's] claim (and the entire case) as a matter of law." *Id.* at *9. The same can be said here. The Court simply does not know at this point whether discovery will "unearth a factual dispute as to whether such minimal efforts were made," or whether instead discovery will "sufficiently fill in the gaps in terms of what [Evans told the arresting officers or what the officers saw or knew] to allow Defendants to clear the admittedly low threshold of probable cause." *Id.* Therefore, Evans's Fourth Amendment claim against the arresting officers survives Defendants' motion to dismiss.

### 4.  INVESTIGATING OFFICER'S DUTY TO INVESTIGATE

The extent to which Officer Lonski had a duty to investigate must be judged separately from the arresting officers. *See Herrera*, 2015 WL 7731867, at *3 ("Once

the question ceased to be one of arresting and processing someone who might well have been a dangerous criminal, however, the complexion of the situation that faced [the investigating officers] changed. For then those Officers could act with greater deliberation and so would have to stand responsible if it turned out that they rotely passed [the plaintiff] around through the bureaucracy (1) without regard for totally exculpatory information already in their possession *or at their beck and call* and (2) without stopping to consider that it could be their duty to consult that information.") (emphasis added); *see also BeVier*, 806 F.2d at 128 ("The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.").

Defendants argue that Lonski cannot be blamed for failing to discover that Evans was indeed the security guard because he questioned Mohammad about Evans's identity and Mohammad gave him incorrect information. This may be a winning argument on a motion for summary judgment but it is not a proper one on a motion to dismiss. It is enough that Evans has alleged facts that plausibly suggest a constitutional claim based on Lonski's failure to take reasonable steps that would have led to the discovery that Evans was not the burglar. Lonski presumably is experienced in police investigation and therefore familiar with the use of aliases. An argument can be made that a reasonable investigation would have taken into consideration the possibility that Mohammad did not know Evans by the name of "Charles." For example, Lonski could have questioned Evans after speaking with Mohammad (the Court assumes based on the current record that he did not). If

23

Lonski had told Evans that Mohammad denied having hired a security guard named "Charles," Evans presumably would have responded by clearing up the misunderstanding about his name. Lonski also could have followed up on Mohammad's answer that he did not know anyone named "Charles" bv either showing Mohammad a photograph or asking him to come to the station to determine whether he could identify the suspect being held by the police. As Evans argues, "[s]uch a simple act would have prevented Plaintiff's unjust arrest and four month detention." R. 31 at 6. Evans further argues that "Defendants' woeful attempt to identify Plaintiff by asking Mr. Abdullah if 'Charles' works for him failed to satisfy proper identification by a credible victim. The burden of further investigation, weighed against the gravity of four months' detention, was negligible." *Id.* at 5. On the current record and without knowing anything more, the Court must agree with Evans's arguments. Therefore, the Court concludes that Evans has plausibly alleged a Fourth Amendment violation against the investigating officer.[11]

---

[11] In their reply, Defendants argue that showing Mohammad a photograph or having him make an in-person identification would only "make sense in a situation in which the victim saw the offender's face during the commission of the crime," which is not "what happened in this case." R. 32 at 3. But the purpose of showing a photograph in this case was not to have Mohammad identify who the burglar was; it was to have him identify who his security guard was. One would assume Mohammad had seen the face of his security guard before and therefore could identify him. Apparently, though, Defendants do not think so. *Id.* at 1-2 (seeming to argue that Mohammad might not have been able to identify Evans even if he had been asked to look at a photograph or come to the police station). It is not clear to the Court why Defendants suggest that Mohammad might not have been able to identify Evans, but in any event the issue is clearly a factual one that requires further discovery to sort out. In fact, the entire situation with Mohammad's

### B.   UNREASONABLE DETENTION

Evans's detention in jail after his initial appearance in court is governed by the due process clause of the Fifth Amendment. *See Hernandez v. Sheahan*, 455 F.3d 772, 777 (7th Cir. 2006).[12] "Due process requires more than mere formal adherence to minimally adequate procedures—it has a substantive aspect as well. And pretrial detention offends substantive due process when 'an executive abuse of

---

inability to identify Evans is confusing on the current record. For instance, Defendants state that Lonski testified at the preliminary hearing that, after seeing Evans on the video, Mohammad told Lonski "he knew Plaintiff from using the store and being in the area." R. 28 at 5 n. 4. If Lonski's preliminary hearing testimony is credited, however, then why did Mohammad testify at the trial that he could not identify either of the persons on the video? Moreover, the actions of the second person in the video were at least consistent with that person being a security guard, which suggests that further questioning of Mohammad about the security guard was called for, even if Mohammad claimed to not have hired a security guard named "Charles." Given these ambiguities in the record, the Court cannot currently say, as a matter of law, that it was reasonable for Lonski to have relied on Mohammad without conducting any further investigation.

[12] It is irrelevant that the complaint does not refer specifically to either a due process violation or the Fifth Amendment. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (per curiam) (stating that the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"). Moreover, it is possible, although the Court need not decide at this time, that the Fourth Amendment also comes into play at the pretrial detention stage. *See Graham*, 490 U.S. at 395 n. 10 (holding that due process standard applies to a pretrial detainee but declining to decide which standard applies beyond the point at which arrest ends and pretrial detention begins); *Gerstein*, 420 U.S. at 113-14 (holding that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest); *see also Herrera*, 2015 WL 7731867, at *4 (noting that "unique circumstances . . . may well take [a] case out of the conventional wisdom . . . that 'the fourth amendment drops out of the picture following a person's initial appearance in court,'" and explaining that "[n]either the Fourth Amendment nor the Fifth Amendment's due process clause permits officers to stick their heads in the figurative sand to justify detaining someone regardless of whether they play ostrich before the initial appearance or only afterwards") (citation omitted).

power shocks the conscience.' Where there is time for cool reflection, a deliberately indifferent act may rise to the level of a constitutional violation. And unlike allegations of an Eighth Amendment violation, deliberate indifference in the due process context is equated with tort rather than criminal recklessness: It is a 'conscious disregard of known or obvious dangers' and is satisfied 'even though the defendant obtusely lacks actual knowledge of the danger.'" *Herrera,* 2015 WL 7731867, at *4 (citations omitted).

While substantive due process sets a fairly high threshold for asserting a constitutional claim, the Court cannot say on an undeveloped factual record that it would be impossible for Evans to surmount that threshold. The more than four months' deprivation of liberty that Evans endured raises some serious concerns, given that the current factual record suggests that the mistaken identity problem easily could have been resolved on the very same day as the arrest. *See Walker v. Considine*, 2014 WL 6820130, at *3 (N.D. Ill. Dec. 3, 2014) (unreasonable detention based on failure to investigate an alleged mistaken identity may present a viable due process claim); *Griffin v. Sheahan*, 1999 WL 417342, at *4 (N.D. Ill. June 16, 1999) (rejecting on a motion to dismiss the defendants' theory that "once the custodian takes a detainee before a judge, the custodian's responsibility for the detainee is absolved as a matter of law and the custodian becomes immunized from liability for any subsequent detention which is mistaken," and also rejecting that a detention period of three days "was, as a matter of law, insufficient in duration to constitute a prolonged detention"); *Johnson v. City of Chicago*, 711 F. Supp. 1465,

1470 (N.D. Ill. 1989) ("a prolonged detention, coupled with the failure to investigate a claim of mistaken identification, may suggest a deprivation of liberty without due process"); *cf. Baker*, 443 U.S. at 145 (assuming arguendo that "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law'").

In *Whitley v. Seibel*, 613 F.2d 682 (7th Cir. 1980), the court suggested that the plaintiff might have been partly responsible for his continued confinement because he appeared to have chosen not to present evidence at the preliminary hearing that would have revealed his alibi. Notwithstanding the court's discussion in that case of the function of a preliminary hearing under Illinois law, in this case, by sustaining the state's objections to questions by defense counsel that seemed directed at Evans's mistaken identity defense, the trial court appears to have prevented Evans from calling attention to his mistaken identity defense at the preliminary hearing. In any event, since the parties have not addressed the due process issue, the Court will not conduct any further analysis of it under the facts as they currently appear from the pleadings other than to quote from another district court case which also dealt with a mistaken identity issue (although of a different nature), where the plaintiff was wrongfully held in jail for five *weeks* following his arrests:

> "This is not a case . . . where the validity of [Plaintiff's] alibi depended upon the veracity of witnesses who might have an incentive to lie, or was circumstantial and dependent on a series of inferences. To the contrary, there

was objectively verifiable information from official sources that Officer Jones could have consulted with minimal effort: a mug shot of the suspect and criminal records that would have definitively established that the wrong person had been arrested. As a definitional matter, no "investigation" was required, just verification of a single fact[.] With Kelly safely in custody, confirmation of that fact would not have interfered with Officer Jones' discharge of his duty or required him to do anything more than check information available to and routinely used by police. In evaluating issues of probable cause and the duty of an officer to consider potentially exculpatory evidence, the Tenth Circuit has recognized a distinction between "fundamental" evidence, which an officer must consider, and evidence that could be subject to a variety of interpretations. The evidence here would certainly be considered fundamental, given that it was objective evidence from an official source which would completely exonerate the suspect. Other circuits have recognized that in evaluating an officer's assessment of probable cause, courts need to consider not just how the particular officer assessed the case, but how a police officer acting reasonably under the circumstances should have perceived it. Or, as the Seventh Circuit has described the duty, "[a] police officer may not close his or her eyes to facts that would help clarify the circumstances of an arrest." [citing *BeVier*, 806 F.2d at 128] . . . Kelly is at a minimum entitled to discovery on his claims. There was clearly reason to question whether the correct suspect had been arrested; no legitimate law enforcement purpose would be served by keeping an innocent person in custody; and I am persuaded that failure to consult a readily available trustworthy source of official information could be considered shocking, where the consequence of refusing to take such a simple action resulted in a deprivation of liberty.

*Kelly v. Jones*, No. 14-CV-4317, 2015 WL 8477960, at *4-5 (E.D. Pa. Apr. 17, 2015),

*vacated in part in other grounds*, 2015 WL 5144187 (E.D. Pa. May 13, 2015),

*reinstated*, 2015 WL 7574348 (E.D. Pa. Nov. 24, 2015); *see also Patton v. Przybylski*,

822 F.2d 697, 700-01 (7th Cir. 1987) ("An innocent person was allowed to languish

in jail for almost a week; and to arrest a person over his vigorous protest that he is the wrong man—a protest given some credibility in this case by the driver's license—and keep him in jail for this period without either investigating the case or bringing him before a magistrate raises serious constitutional questions, under the Fourth Amendment if the arrest was improper or under the due process clause if the arrest was proper and the complaint is that the arrested person, having been deprived of his liberty by being incarcerated, was denied due process."); *cf. Kruse*, 2007 WL 128877, at * 17 (observing that the "investigating officer's excuse for his failure to investigate plaintiff's alibi which would have confirmed that plaintiff could not have committed the crime "shows a disturbing lack of concern not only for the civil rights of a suspect in custody who was likely innocent of the armed robbery charge, but also for the fact that the actual perpetrator of the crime may have eluded arrest").

## C.   QUALIFIED IMMUNITY

In the alternative, Defendants argue that they are entitled to qualified immunity. Qualified immunity "protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 657 (7th Cir. 2012) (internal quotation marks and citation omitted). In determining whether qualified immunity applies, the Court asks: "(1) whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a constitutional violation; and (2) whether the constitutional

right at issue was clearly established at the time of the alleged violation." *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012). If both questions are answered in the affirmative, the officer is not entitled to qualified immunity. Because the Court has already found that the answer to the first question is plausibly yes, it turns to the second.

"To determine if a right was clearly established at the time of an alleged violation, we look at whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation." *Id.* (internal quotation marks and citation omitted). "[A] defendant is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, a reasonable officer could have mistakenly believed that probable cause existed." *Fleming v. Livingston Cnty. Ill.,* 674 F.3d 874, 880 (7th Cir. 2012) (internal quotation marks and citation omitted). "This standard is often dubbed 'arguable probable cause.' Arguable probable cause is established when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Id.* (internal quotation marks and citations omitted) (emphasis in original).

As discussed above, viewing the facts in the light most favorable to Evans, Defendants have not established that they had probable cause to arrest Evans. But, as just noted, qualified immunity "applies not only to those officials who correctly determine that probable cause to arrest exists, but also to those governmental officials who reasonably but mistakenly conclude that it does." *Spiegel*, 196 F.3d at

723. Defendants argue that their mistaken belief that Evans was not the security guard was reasonable given Mohammad's statement to Lonski that he did not know anyone named "Charles." The Court already has addressed why the record does not conclusively show what Mohammad said or did not say to Lonski about Evans or the identity of his security guard. Moreover, even if Defendants' version of what Mohammad told Lonski is accurate, the Court already has discussed why it may not have been reasonable for Lonski to have accepted Mohammad's answer without further investigation. The Court further has discussed why it may not have been reasonable for the arresting officers to conclude that Evans broke into the Mini Mart with the intent to commit theft without first attempting to verify his status. Accordingly, for essentially the same reasons as the Court concluded that the complaint plausibly alleges that Defendants' lacked probable cause to arrest and imprison Evans up to and through his trial, and that both the arresting officers and the investigating officer plausibly had a further duty to investigate Evans's claim that he was the security guard, the Court also finds that the complaint alleges facts that plausibly suggest there was not even "arguable probable cause" for that same conduct and failure to investigate. *See Claeys*, 2004 WL 2124621, at *8 n. 4. Defendants therefore are not entitled, at least at this point in the proceedings, to qualified immunity.

## II.    COUNT II—INDEMNIFICATION CLAIM

Because the Court denies Defendants' motion to dismiss Evans's § 1983 claims, dismissal also is not appropriate on Evans's claim against the City for indemnification. *See Claeys*, 2004 WL 2124621, at *11.

## CONCLUSION

For the forgoing reasons, Defendants' Joint Motion to Dismiss Plaintiff's First Amended Complaint, R. 28, is denied.


ENTERED:


_____ *Thomas M. Durkin*
Honorable Thomas M. Durkin
United States District Judge


Dated: April 11, 2016